# LICENSE AND CONCESSION AGREEMENT

**THIS LICENSE AND CONCESSION AGREEMENT** made as of J∂7Ч day of _April_, 2002 by and between **Eagles Stadium Operator LLC, a Pennsylvania Limited Liability Company** ("Licensor") with offices at NovaCare Complex, One NovaCare Way, Philadelphia, PA 19145 and **Penn Sportservice, Inc.**, a Pennsylvania corporation (the "Licensee"), with offices at 40 Fountain Plaza, Buffalo, New York 14202.

## WITNESSETH:

**WHEREAS**, Licensor is in the process of developing and constructing a new NFL football stadium and related facilities (the "Stadium") to be located on the site generally described in Exhibit "A" (the "Site") and intended to be used as the home field for the NFL football franchise owned by an affiliate of Licensor;

**WHEREAS**, Philadelphia Authority for Industrial Development (the "Owner") is the subtenant in possession of the Site and the right of Licensor to use the Site is governed pursuant to the terms and conditions of that certain Sublease and Development agreement by and between Owner and Licensor dated December 7, 2001 (the "Stadium Lease");

**WHEREAS**, the Licensee is engaged in the concession business and is experienced in concession services; and

**WHEREAS**, the parties desire to enter into this License and Concession Agreement whereby Licensee will operate certain food and beverage operations during all Events conducted in the Stadium.

**NOW, THEREFORE**, in consideration of the premises hereto and the mutual covenants hereinafter set forth, the parties agree as follows:

## ARTICLE 1

## Definitions

**Additional Indemnities**:  Shall include the Philadelphia Eagles Limited Partnership, Owner, City of Philadelphia, and any mortgagee holding a lien upon Licensor's interest in the Stadium Lease.

**Affiliates**:  Any legal or natural person or entity directly or indirectly controlling or controlled by or under direct or indirect common control with a person.  For purposes of this definition, "control" when used with respect to any entity means the power to direct the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

**Alcoholic Beverages**:  Shall mean all alcoholic drinks, beers and wines.

**Architectural Drawings**: Certain design and architectural drawings for the Concession Facilities, including the Leasehold Improvements (Edition No. CCD), prepared by NBBJ Sports and Entertainment and last revised on August 15, 2001 as more fully identified on Exhibit "B" attached hereto.

102444.00401/10894895v9

Dockets.Justia.com

**Licensed Products**: shall mean any products sold by Licensee (which Licensor required Licensee to sell) for which Licensee is required to pay a Licensed Products Charge. Only such products which Licensor specifically designates shall qualify as Licensed Products. At Licensee's request Licensor, in its sole discretion, may approve for sale other "name brand" products, but such products shall not be considered Licensed Products for the purpose of this Agreement and Licensee shall be solely responsible for any charges related to such "name brand" products. The following products are the type of product which generally would be considered a Licensed Product within the food and beverage concession industry: Pizza Hut, Subway sandwiches, Burger King hamburgers.

**Licensed Products Charges**: shall mean the royalties, franchise, license and other similar charges paid by Licensee in connection with the sale of Licensed Products.

**Catering Services**: Shall mean food and beverage service for which payment is billed or received for pre-arranged group services.

**City**: City of Philadelphia, Pennsylvania.

**Closing Date**: Date of execution of this Agreement.

**Commencement Date**: the date of the first Event held in the Stadium including without limitation a "Grand Opening" or "Open House" type event.

**Common Areas**: All loading docks and facilities, freight elevators, common passage areas, employee rest rooms, and appurtenant easement and access areas thereto provided such Common Areas are reasonably necessary for Licensee's use of the Concession Facilities for the purposes set forth herein. The use by Licensee of all Common Areas shall be subject to all Legal Requirements and any reasonable rules and regulations established by Licensor from time to time, including scheduling rules and regulations.

**Concession Equipment**: All equipment used by Licensee from time to time in providing for the preparation, display and sale of Refreshments at the Stadium under this Agreement, including but not limited to all equipment used for storing food and/or beverages, preparing, cooking, serving, holding, selling, and vending same, warewashing equipment, all equipment and displays used for display and storage of products, all inventory control and point of sale equipment, security and surveillance equipment, and registers, telephones and telecommunications equipment, and furniture, lifts, transports, and motor vehicles used in reception or delivery of food and beverages, all bar and beverage equipment, all refrigeration equipment, coolers and walk-ins, all furniture, furnishings, office equipment, computers and all other fixed assets located in the Concession Facilities, from time to time, such as menu boards for concession stands, bars and other public food/beverage service outlets and all Smallwares. The Concession Equipment to be purchased by Licensor is described on Exhibit "C" attached hereto. In no event shall equipment used or to be used by the Premium Caterer be deemed to be Concession Equipment.

**Concession Facilities**: All those areas within the Stadium to be occupied and used by the Licensee in connection with the performance of its obligations hereunder, including, but not limited to, the Licensee's kitchen and commissary and food and beverage service storage areas, food and beverage wash areas, pantry areas, food preparation and food and beverage cleaning areas, change rooms for food and beverage personnel, concession stands, booths, bars, public and service bars, offices, money counting and record-keeping rooms dedicated for the Concession Service operations located within the Stadium, all as shown on the Architectural Drawings. Concourse overviews showing the Concession Facilities as marked in pink are attached as "Exhibit B-1". Those areas of the Stadium to be occupied by

Mobile Stands shall also be considered Concession Facilities, although the location of same will be determined by Licensor from time to time hereafter. Licensor reserves the right, at its sole cost and expense, to relocate the Concession Facilities within the Stadium from time to time during the term of this Agreement either on a temporary or permanent basis. In no event shall areas or facilities to be occupied or to be used by the Premium Caterer, as shown on the Architectural Drawings, be deemed to be Concession Facilities.

**Concession Services**: Subject to Section 3.1(f) hereof, the sale of Refreshments from the Concession Facilities within the Concession Service Area and through the use of roving vendors and hawkers (as approved by Licensor) within the Concession Service Area.

**Concession Service Area** The following areas of the Stadium: (i) the general seating areas on the Main Concourse Level and Upper Concourse Level; (ii) the concourse on the Main Concourse Level and Upper Concourse Level; (iii) the club seating areas on the Club Level (to the extent such club seating areas are designated on the Architectural Drawings); (iv) the portions of the concourse on the Club Level serving such club seating areas; and (v) subject to Section 13.17, the Plaza. The Concession Service Area shall not include the Excluded Areas.

**Date of Substantial Completion**: Date of substantial completion of Licensor's construction of the Stadium and the Concession Facilities in accordance with all Legal Requirements. The foregoing work shall be deemed substantially completed notwithstanding the need for minor punch list type repairs or adjustments which do not materially affect Licensee's business operations required to be performed pursuant to this Agreement.

**Default Rate**: Shall mean a rate per annum equal to the lesser of (i) a varying rate per annum that is equal to two percent (2%) per annum over the "Prime Rate"(as published in the Wall Street Journal, or successor periodical) from time to time with adjustments in that varying rate to be made on the same date as any change in that Prime Rate and (ii) the maximum non-usurious rate permitted by Applicable Law, with adjustments in that varying rate to be made on the same date as any change in that rate.

**Event**: Shall refer to all events open to the public at large held at the Stadium, including but not limited to NFL games, similar athletic events and concerts.

**Excluded Areas**: Shall mean (a) private suites or similar luxury boxes in the Stadium; (b) any restaurant in the Stadium; (c) any other area to be used exclusively by the Premium Caterer, as shown by blue markings on Exhibit "B-1" attached hereto (d) the Outside Areas (except as may be designated by Licensor from time to time); (e) areas (other than the Concession Facilities) designated by Licensor for the use of Licensor and/or entities other than Licensee including the locker rooms, administrative offices of Licensor and media dining areas and (f) the areas designated on the Architectural Drawings as the restaurant level of the headhouse and the "Eagles Nest." .

**Fiscal Year**: Shall mean the 12 month period commencing February 1 of each year during the term of this Agreement, except the first fiscal year which shall commence on the Commencement Date.

**Force Majeure**: Force Majeure shall be defined as an act of God, riot, invasion, fire, accident, strike, or walk-out, or government interference, regulation, appropriation or rationing or inability to secure goods and materials or shipments or any other event or condition similar to those enumerated above, beyond the control of the party obligated to perform hereunder.

**GAAP**: Generally accepted accounting principles, consistently applied.

**Governmental Authority**: Shall mean any and all applicable courts, boards, agencies, commissions, offices or authorities of any nature whatsoever for any governmental or quasi-governmental unit (federal, state, county, district or municipal), whether now or hereafter in existence.

**Gross Sales**: Shall mean the total amount of money, service and rental charges received or charged by the Licensee, any agent, any employee or any sub-contractor or sublicensee of the Licensee for all sales, cash or credit (whether collected or not), made as a result of the rights granted under the Agreement, excluding only applicable sales taxes. MBE Subcontractor Gross Sales shall not be included as part of Gross Sales nor used in any calculation related thereto including calculation of Percentage Rent due License pursuant to this agreement. No deduction for inventory, bad debt, cash or credit losses may be made from Gross Sales. Product returns, refunds, rebates, employee meals and reduced priced sales made to Licensor at Licensor's written request and MBE Subcontractor Supervisory Fees collected by Licensee are excluded from Gross Sales. Gratuities collected by Licensee in connection with private parties or similar type Events and actually paid to Licensee's employees shall also be deducted from Gross Sales.

**Hazardous Substance**: Substances that are defined or listed in, or otherwise classified pursuant to, any Legal Requirements (or other enforceable criteria and guidelines promulgated pursuant thereto) as "hazardous substances," "hazardous materials," hazardous wastes," "toxic substances," "pollutants," "contaminates," "radioactive material," "petroleum or any fraction thereof" or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, radioactivity, carcinogenicity, reproductive toxicity, or "EP toxicity," and petroleum and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal energy.

**Leasehold Improvements**: Shall mean all leasehold improvements to be constructed as part of the Concession Facilities, including but not limited to, as applicable, all demising walls, doors, and doorways, flooring, floor coverings and treatments (i.e. sealants), walls and wall coverings and wall treatments, millwork, cabinetry and counters, dropped ceiling grids and tiles, soffits, roll down security grills, general lighting, all exterior and interior finishes, and all Utility Systems for the Concession Facilities. The leasehold improvements are more fully described on those certain plans and specifications identified on Exhibit "B-2" attached hereto.

**Legal Requirements**: Shall mean any and all present and future laws, statutes, ordinances, decisions, decrees, statues, ruling, rules, codes, procedures, orders, regulations, permits, certificates, licenses, and any other requirements of any Governmental Authority including, without limitation, any safety laws, health laws, environmental laws and laws regarding the rights of and obligations of the handicapped and disabled, including without limitation, the Occupational Safety And Health Act and the Americans With Disabilities Act.

**Mobile Stands**: Shall mean all portable concession stands and bars, carts, and kiosks used by Licensee hereunder as approved by Licensor pursuant to this Agreement.

**NFL**: National Football League

**Occupancy Taxes**: Shall mean a tax on rental payments or an ad valorem tax imposed, assessed or levied by the City of Philadelphia or County of Philadelphia (or any taxing jurisdiction that is a subdivision of the foregoing): on or with respect to Licensee's rights and interests created by this Agreement, including, but not limited to, Licensee's rights of occupancy and use of the Concession Facilities and Concession Equipment provided, however, Occupancy Taxes shall not include real estate

taxes assessed or imposed on the Site or the Stadium. In the event that Licensee receives any written notice of any such Occupancy Taxes, immediate notice thereof shall promptly be provided to Licensor, Licensee shall have the right (but not the obligation) to initiate (or cause to be initiated) a contest of any such Occupancy Taxes, in which event Licensor shall cooperate in its opposing or contesting of such levy or assessment, provided that Licensor believes, in good faith, that Licensee's contest has merit. In the event of any such contest, Licensor and Licensee shall each bear their own costs and expenses in connection therewith. Notwithstanding the foregoing, the parties acknowledge that Licensor has entered into a Settlement Agreement dated December 7, 2001 ("U&O Agreement") with the City with respect to the payment of all Philadelphia Use and Occupancy taxes ("U&O Tax") levied in connection with the Stadium, including the use of the Concession Facilities. Licensee acknowledged receipt of a copy of the U&O Agreement. Pursuant to such U&O Agreement, Licensor has agreed to pay a fixed amount of U&O Tax to the City during the term of the Stadium Lease. Licensee hereby agrees to pay Licensor a portion of such fixed amount payable to the City by Licensor in an amount equal to $30,000 per year for each year of the Term; provided however, such $30,000 fixed payment is subject to increase in the same proportion as Licensor's payment to the City may be increased pursuant to Section 3(a) of the U&O Agreement. Such sum is hereinafter referred to as the "Licensee Contribution" and shall be payable by Licensee to Licensor within 30 days after receipt of an invoice from Licensor. Licensee agrees not to contest any U&O Tax liability relating to the Stadium or the Concession Facilities. The Licensee Contribution is the only amount and the entire amount payable by Licensee on account of the Philadelphia Use and Occupancy Tax. Provided Licensee pays the Licensee Contribution, Licensor will pay to the City of Philadelphia all sums payable by Licensor under the U&O Agreement.

**Other Events:**     This refers to all events other than professional football games held at the Stadium.

**Outside Areas:**     Shall mean those areas surrounding the Stadium (other than the Plaza) which the Licensor directly or indirectly controls, from time to time.

**Person:**     Shall mean any individual, corporation, partnership, association, trust of other entity whatsoever.

**Plaza:**     Shall mean the area surrounding the Stadium located at parking lot level and enclosed by fencing, shown in green on Exhibit "A" attached hereto available only to ticketed patrons, where Licensee shall be required to offer Concession Services.

**Premium Caterer:**     Shall mean that Person or Person(s) providing additional or supplemental food and/or beverage services in the Excluded Areas pursuant to separate agreement(s) with Licensor or its affiliates. Premium Caterer shall not have the right to provide alcoholic beverages in areas covered by the liquor license obtained by Licensee pursuant to this Agreement.

**Refreshments:**     All food and all alcoholic and nonalcoholic beverage products to be sold and/or distributed at the Stadium by Licensee including, but not limited to meals, snacks, confections, candies and all other food and beverage products. Refreshments do not include retail merchandise items.

**Rent:**     Means the rents and fees due from Licensee to Licensor for the exclusive use of the Concession Facilities and the grant of rights hereunder, all as provided in Sections 5.1 and 5.2 hereof.

**Sales Taxes:**     Tax on sales, excise taxes or value-added taxes assessed, based on Gross Sales of Licensee hereunder.

**Smallwares:**  Shall refer to the serviceware, utensils, crockery, glassware, dishware and cutlery used in the Concession Service operation. The budget for Smallwares to be purchased by Licensor is set forth on Exhibit "C" hereof. All other Smallwares required by Licensee (the costs of which exceed the budget) shall be purchased by Licensee at its sole cost.

**Stadium Rights:**  Shall mean all intellectual, industrial and other proprietary rights in and to (1) the design, structure or image of the Stadium or any entertainment facility therein; (2) Events held at the Stadium, including the right to copy, reproduce or otherwise exploit the same, and the copyrights and trademarks related thereto; and (3) the naming or similar sponsorship rights for the Stadium.

**Start Up Costs:**  Costs incurred by Licensee for the initial opening of its operations at the Stadium.

**MBE Subcontractors Sales:**  Gross Sales of any MBE Subcontractor(s) of Licensee engaged pursuant to Section 6.11(e) hereof.

**MBE Subcontractors Supervisory Fee:**  A fee collected by Licensee for supervising MBE Subcontractors retained pursuant to Section 6.11(e). Such fee shall be equal to 5% of such MBE Subcontractor(s) MBE Subcontractors Sales.

**Utility Systems:**  Means all utility systems supplying utility services required to operate the Concession Facilities, as such Utilities Systems are shown on the drawings referenced on Exhibit "B-3" attached hereto including water, sewage (including but not limited to all permits, fees and tap fees), gas, plumbing and lighting, sprinkler (including runs, drops and heads) and fire safety, telephone and telecommunication and security facilities, piping (including drains and grease traps for sewage), ductwork, conduit, wiring (including all electrical panel boards, subpanels and transformers), outlets and connections and mechanicals (as applicable); and heating, ventilating, and air conditioning equipment, ductwork (including runs and defusers) and electrical components and all applicable elevators. As used herein, water shall mean water that is fit for human consumption and otherwise in compliance with all Legal Requirements. Any changes or additions desired by the Licensee may be provided, if approved by the Licensor, at the Licensee's sole expense.

## ARTICLE II

### Design and Construction

**2.1    Licensor's Responsibilities.**

     (a)    On or before the Commencement Date, Licensor shall construct the Stadium and as a part thereof, the Concession Facilities (including all Leasehold Improvements related thereto) as such Concession Facilities are described and in accordance with the Architectural Drawings and applicable Legal Requirements.

     (b)    In connection with the foregoing, Licensor shall: (i) construct, provide and distribute all Utility Systems to the Concession Facilities in accordance with the Architectural Drawings and applicable Legal Requirements; and (ii)    pay all costs related to purchase, delivery, installation and connection of all Concession Equipment listed as part of the Architectural Drawings and Exhibit "C".

**2.2    Licensee's Responsibilities.**

(a)    Contemporaneously with the signing of this Agreement by Licensee, Licensee shall pay Licensor the sum of $143,000 plus $13,187 for reimbursables as a reimbursement to Licensor for Licensor's cost and expenses incurred pursuant to that certain Design Agreement dated December 23, 2000 by and between Licensor and Cini Little, Inc. respecting the preparation of certain portions of the Architectural Drawings.

b)    In addition, Licensee shall be responsible, at its sole cost and expense, for providing any and all uniforms and Smallwares (in excess of those purchased with the sums set forth on the budget attached as Exhibit "C") which Licensee may require in order to perform its operations hereunder and for all of its own Start Up Costs.  The design of all uniforms and similar advertising or designation of Licensee to be used at the Stadium is subject to the prior written approval of Licensor.

## ARTICLE III

### Grant of Operating Rights, Leasehold Interests & Term

**3.1    Scope of Operating Rights.**

a)    Subject to the terms of this Agreement (including 3.1(b) below) and during the Term hereof, Licensor hereby grants Licensee the exclusive right to provide Concession Services from the Concession Facilities at all Events held at the Stadium, excluding vending machines.  All Concession Services to be provided by Licensee shall be conducted in a professional, first class manner and in accordance with all applicable Legal Requirements and reasonable standards implemented by Licensor relating to health and/or safety, operating issues and general rules and regulations related to use of the Stadium.

b)    All Concession Services shall be conducted in accordance with the terms and conditions of this Agreement by Licensee from the Concession Facilities (including the Mobile Stands), and from roving vendors and hawkers.  Additionally such Concession Services shall be conducted by Licensee from such other areas of the Stadium, Plaza or Outside Areas as may be designated by Licensor in writing from time to time.  Any such Concession Services shall be performed in accordance with the terms and conditions of this Agreement.  In connection therewith, Licensee acknowledges that the use of the Plaza and Outside Areas are subject to the terms and conditions of the Stadium Lease.  Licensor may require Licensee to serve Outside Areas on an event specific non-exclusive basis.

c)    Chewing gum and tobacco products may not be sold in the Stadium.

d)    Alcoholic Beverages shall not be sold by Licensee in the Outside Areas except for special events and parties in confined areas at Licensor's prior written request.  If required Licensee shall obtain special catering licenses for such events.  Licensee shall, at all times, abide by Licensor's alcoholic beverage sales policy in place from time to time

e)    Notwithstanding the terms of Section 3.1(a) and (b) above, Licensee shall not have the right to sell Refreshments in the Excluded Areas or to provide Catering Services (including without limitation at private "Non-Event" functions) without a separate written catering agreement with Licensor.

f)    Licensor reserves the right to require Licensee to modify its normal food and beverage menu selections on an Event by Event basis provided such requested modifications are

commercially reasonable. Licensor shall provide Licensee with reasonable notice prior to the Event if Licensor requires any such menu restrictions or modifications.

g)    Licensee shall cooperate with Licensor in modifying Licensee's operations to accommodate charitable events which are held at the Stadium provided any such requested modifications are commercially reasonable.

h)    No off-site or subcontracting of sales are permitted by Licensee without the written permission of Licensor.

3.2    **License of Facilities & Equipment.**

(a)    In conjunction with the exercise of the foregoing rights, Licensor hereby grants a license to Licensee to occupy and use on an exclusive basis during the Term hereof all Concession Facilities and Concession Equipment, now existing or hereafter constructed, located or expanded within the Stadium. The Licensor warrants and covenants, subject to the other provisions of this Agreement, that for so long as Licensee performs its obligations hereunder, Licensee shall and may peacefully and quietly have, hold, operate and enjoy the Concession Facilities and Concession Equipment therein, to the exclusion of all others (except as expressly set forth herein), for the purposes provided hereunder during the Term of this Agreement as an agreement running with the leasehold estate of Licensor subject, however, to the terms and conditions of this Agreement. Licensor also hereby licenses to Licensee, for its use in common with others on a nonexclusive basis, all Common Areas of the Stadium, and appurtenant easement and access areas thereto to the extent necessary for the customary and reasonable use of the Concession Facilities and Concession Equipment.

(b)    Notwithstanding the foregoing, the Licensor and its designated agents reserve the right of access to all areas licensed to Licensee hereunder for purposes of inspecting, maintaining and repairing the Stadium, and all improvements therein or thereon and all Utility Systems related thereto. Use of any space or property leased or licensed to Licensee hereunder for purposes other than the operations to be conducted under this Agreement, without prior written approval of the Licensor in its sole discretion, shall not be permitted.

(c)    Location of all Mobile Stands and any auxiliary storage space required by the Licensee, from time to time, must be approved by the Licensor in writing. The Licensee shall acquire no rights to such locations if assigned, and the Licensor reserves the right to require the Licensee at its cost to move Mobile Stands and to relocate items from any auxiliary storage space when needs of other Events or similar matters require the use of same. However, Licensor covenants to provide all Utility Systems and Services for Mobile Stands so as to efficiently operate such Mobile Stands. The number of Mobile Stands shall be subject to mutual approval.

3.3    **Term.**

(a)    The "Term" of this Agreement shall commence on the Commencement Date and terminate without the need for notice or other action by either party on the completion of the fifth full NFL season (including playoff games) played in the Stadium. Notwithstanding the foregoing, if less than 8 NFL football games (including exhibition games) are held at the Stadium during any Fiscal Year of the Term, the Primary Term shall be automatically extended for an additional Fiscal Year; provided however that Licensee shall not be entitled to more than one 1 year extension unless a total of 8 more NFL football games were cancelled during the remaining term of this Agreement, as same may have been extended.

(b)    The Licensee's exclusive occupancy and use rights to the Concession Facilities and the Concession Equipment shall commence upon the date of Substantial Completion of the Concession Facilities.

## ARTICLE IV

### Responsibilities of the Licensor

**4.1    Maintenance/Repair/Replacement.**

Subject to Licensee's obligations as set forth in Section 6.7 hereof, Licensor shall be responsible for maintenance and repair of the Stadium and Utility Systems and for the replacement of Concession Facilities and Concession Equipment, except to the extent that any of the foregoing are damaged by the negligence or intentional act of Licensee (normal wear and tear excepted), in which case Licensee shall be responsible for the cost of repair or replacement of same. Licensor and Licensee agree that prior to the beginning of each Fiscal Year, a representative of the parties hereto shall inspect the Concession Equipment and at that time by mutual agreement determine the condition of said equipment and in the event that it shall be determined that repair is desirable or necessary to place said equipment in an operable condition, then Licensee shall, at its sole cost and expense, provide such repairs, prior to the beginning of the Fiscal Year.

**4.2    First Class Operation.**

The Licensor covenants to use all reasonable efforts to operate its shows and sporting events in the Stadium in a manner consistent with the Stadium's physical design, subject to compliance with all applicable laws.  The Licensor will use its commercially reasonable efforts to keep any and all necessary governmental licenses and permits applicable to its operations in full force and effect.  Licensor does not guarantee the quantity, quality or attendance of events occurring at the Stadium.

**4.3    Attendance Information.**

The Licensor shall upon request furnish to Licensee a projected attendance report at least 48 hours prior to each Event. In addition, Licensor shall provide Licensee with a statement of attendance showing the total number of turnstile admissions for such Event, along with the daily turnstile count, after each Event.

**4.4    Access.**

The Licensor shall provide Licensee's personnel who are scheduled to work with ingress and egress to and from the Stadium through a gate or gates designated for such purpose by Licensor, without charge, during all days on which Events are held and at all other times necessary to enable Licensee to prepare for such Events, and fulfill its other responsibilities hereunder.  Licensor may establish rules, policies and procedures relating to access rights including the requirements related to identification of Licensee's personnel.

**4.5    Security.**

The Licensor shall be fully responsible at its sole cost and expense for providing all commercially reasonable security forces for crowd control at the Stadium and/or to fulfill requirements

of any Governmental Authority or the standards of the NFL with respect to security at the Stadium. The Licensee shall be responsible for all security measures necessary to secure money collection, its cash room and its bank deposits, which security measures Licensor may require Licensee to coordinate with Licensor's security service. The Licensee shall be responsible for the security of its own sales locations and for the monitoring the sale of alcohol to properly identify customers as legal purchasers of Alcoholic Beverages.

**4.6    Third Party Vendors.**

Except with respect to the Premium Caterer(s) and any "Promotional Vendor", as hereinafter defined, and in the Excluded Areas, no other vendors, peddlers or Persons other than those engaged by Licensee shall be permitted to vend, sell or otherwise distribute any Refreshments in the Stadium or in the Plaza. Licensor shall use its commercially reasonable efforts to seek dispersal of any such third parties intending to sell, vend or otherwise distribute Refreshments as aforesaid. For purposes hereof, "Promotional Vendors" shall mean any Person who distributes, without charge to the public, Refreshments in, on or around the Stadium, with Licensor's prior consent for purposes of promoting or introducing a product provided however the packaging of such product shall not exceed 2 oz. for non liquid products and 4 oz. for liquid products, it being the intent to limit such products to "trial size". Additionally, except for medical reasons validated by Licensor in its reasonable judgment and except as otherwise provided by Legal Requirements, patrons at Events shall not be permitted to transport into the Stadium cans, bottles, beverages and/or picnic coolers. Licensor shall use its commercially reasonable efforts to enforce such restrictions.

**4.7    Utility Services.**

Licensor shall furnish to Licensee, at no cost to Licensee, all utilities supplied as part of the Utility Systems.

Licensor shall provide Licensee with telephone and mobile radio (walkie/talkie) service. Licensee shall be responsible to procure and pay all charges for all connection services and shall arrange for direct billing for usage, including long distance charges, loss or replacement of equipment and special services. Licensee's handsets and other equipment connected to Licensor's telephone service shall be compatible with Licensor's system. Licensee, at its own expense, shall have the option to obtain such handsets from Licensor.

The Licensor, under no circumstances, shall be liable or responsible to Licensee in damages or otherwise, including for any consequential economic or property loss, for any interruption of Utility Services. However, to the extent within its reasonable control, it shall use its commercially reasonable efforts to restore immediately to full service any Utility Service which is interrupted.

**4.8    Parking.**

The Licensor will provide the Licensee with parking permits for up to three (3) of its employees pursuant to rules and regulations, and in parking accommodations, to be established by Licensor from time to time.

**ARTICLE V**

**5.1    Consideration.**

(a)     In consideration for the construction of the Concession Facilities and for Licensor's purchasing the Concession Equipment, Licensee shall pay Licensor the Licensee contribution in the amount of Five Hundred Thousand Dollars ($500,000), in cash, upon the signing of this Agreement.

(b)     For the rights granted it hereunder, Licensee agrees to pay Licensor (or its designee) for the occupancy and usage rights granted under this Agreement the "Percentage Rents" set forth below:

(i)     For the first $2,000,000 in Gross Sales in each Fiscal Year during the Term the percentage rent payable shall be 45% of such Gross Sales.

(ii)     For all Gross Sales in each Fiscal Year during the Term in excess of $2,000,000 in any Fiscal Year hereunder, the percentage rent shall be 50% of such Gross Sales.

(iii)     [Intentionally Omitted]

(iv)     The Percentage Rents set forth in Subsection (i) and (ii) above shall be equitably adjusted if the Licensor's policy concerning the sale of alcoholic beverages at NFL football games is restricted so that Licensee is no longer permitted to sell alcoholic beverages in accordance with the policy set forth on Exhibit "D", attached hereto. The Percentage Rents shall not be affected by the policy(ies) governing the sale of alcoholic beverages at other Events, which policy(ies) shall be determined by Licensor at its sole discretion, provided such policy(ies) are in accordance with Legal Requirements. Final decision as to whether or not Alcoholic Beverages may be sold at an event or in any designated area of the Stadium or Outside Areas shall be the sole responsibility of Licensor.

(c)     Gross sales from the sale of Licensed Products will be calculated as part of Gross Sales. However, the Licensed Product Charges will be deducted from the Percentage Rents payable hereunder by Licensee to Licensor.

(d)     The Rents payable pursuant to Section 5.1(a) shall be payable monthly, with each payment due on the 15th day of the following month together with the accounting described in Section 5.3 below. Any payment not received by the 15th day of the month when due shall be subject to a late payment charge equal to the amount of such payment multiplied by the Default Rate.

**5.2     Services to Licensor.**

Refreshments purchased by Licensor, Licensor's stadium manager or other designee, or the Philadelphia Eagles for media dining, meals for auxiliary staff (i.e. security and operations personnel) will be invoiced at 50% of the retail price therefore. The revenues from such services are excluded from Gross Sales. Licensee shall deduct the sum due it as aforesaid from the Percentage Rents due Licensor and provide Licensor with a monthly report of such transactions on or before the 15th day of the following month.

**5.3     Records, Accounting and Audit.**

(a)     Licensee will keep at the Stadium adequate and accurate accounting books and records prepared in accordance with GAAP of all business and transactions conducted under this Agreement, for all periods included within the Term of this Agreement, said records to include without limitation the daily receipts, the daily bank deposits, the daily sales and business done by the Licensee and shall preserve and make available for audit and examination by the Licensor all of such records relating to Gross Sales made. All sales and accounting records and management reports shall be prepared and kept in a format directed by Licensor. Such records will be maintained at its headquarters in Buffalo, New York or at the Stadium for any Fiscal Year of operations hereunder for a period of three (3) years after each such Fiscal Year.

(b)     The Licensee shall maintain such accounting records on a fiscal year basis consistent with the Fiscal Year.

(c)     Throughout the Term of this Agreement, Licensee shall submit to Licensor, within ninety (90) days after the end of each Fiscal Year, a Report of all Gross Sales for such Fiscal Year certified by an independent Certified Public Accountant.

(d)     In the event that Licensor is not satisfied with the statements presented therein, Licensor shall have the right to conduct a special audit of the Licensee's books and records related to its Gross Sales, by auditors selected by Licensor, provided it does so within 12 months following receipt of the above described financial statement. Should such audit(s) uncover a deficiency or deficiencies in payments to Licensor for any period covered, Licensee shall pay to Licensor the amount of such payment deficiency, with interest thereon at the Default Rate from the date the monies were originally due, within 20 days following of receipt of the audit report and Licensor shall have the right to audit Licensee's records pertaining to the Stadium for the prior three (3) years. If such payment deficiency is in excess of one percent of the aggregate amount reported, the cost of the audit shall be immediately due and payable by the Licensee.

(e)     In addition, Licensee must submit the following information to Licensor:

    (i)     A flash report of Gross Sales by 12:00 noon of the day following the Event.

    (ii)     Daily sales reports, in a format directed by the Licensor, and copy of deposit slips of Gross Sales for each Event held at the Stadium, within 48 hours following completion of the Event.

    (iii)     A monthly summary showing Gross Sales (by category described in Section 5.1(b) above and by Event) and Rent payable therefore on or before the 15th day of the following month.

    (iv)     State personal income tax withholding information concerning employees working at the facility (without any reference to the identity of such personnel), all sales and use taxes paid to the Commonwealth of Pennsylvania as a result of sales conducted at the Stadium; and all taxes paid to the Commonwealth of Pennsylvania related to the sale of liquor, wine or malt or brewed beverages. All such information shall be submitted to Licensor on or before February 10 of each year during the term of this Agreement.

(f)    Licensee shall use cash registers provided by Licensor or a Licensor approved inventory system for all sales. Hawkers in seating areas and in-seat servers may make change from Licensee provided apron pockets. Employees at Mobile Stands may make change from a cash box if a cash register is not provided.

## ARTICLE VI

### Additional Duties of Licensee

6.1    **Management of Operations.**

(a)    Licensee agrees to manage and operate in a first class professional manner all of its operations so as to ensure that it will maintain consistent, prompt, and courteous service to the public in accordance with Legal Requirements and Licensor policies and procedures. Licensee shall at all times maintain a sufficient number of qualified personnel at the Stadium for the performance of Licensee's obligations under this Agreement. Licensee's General Manager shall attend meetings to be scheduled by Licensor at the Stadium from time to time during the Term, to review concession operations at the Stadium and will implement Licensor's reasonable recommendations and directives for improving such operations.

(b)    The Licensee will pay promptly all authorized bills, payroll and other expenses incurred in connection with its operations and pursuant to this Agreement.

(c)    The Licensee shall pay when due all license fees, taxes and all retail sales taxes on the products or services which the Licensee provides hereunder, including but not limited to all federal, state and local taxes, workers' compensation payments, unemployment insurance, payroll and other taxes with respect to products or services provided under this Agreement and all other taxes arising from the Licensee's operations hereunder.

(d)    Licensee will provide all necessary working capital and perishable and non-durable inventory required for its operation including, but not limited to Refreshments and paper products.

(e)    Licensee will comply with Stadium operating policies and directives established upon opening of the Stadium and as modified from time to time by the Licensor provided nothing herein shall be construed as materially changing any of the financial terms and conditions of this Agreement.

(f)    Licensee shall use such computer hardware and software for accounting purposes and related functions as may be designated and supplied by Licensor.

6.2    **Personnel.**

(a)    Licensee will hire, train, supervise, discipline and, if need be, dismiss any and all persons necessary to operate the Concession Facilities in accordance with the terms of this Agreement and will use all reasonable efforts to assure that its employees continually practice high standards of cleanliness, safety, courtesy and service customarily followed in the conduct of a first-class operation. Licensee will use its commercially reasonable efforts in selecting qualified, competent and trustworthy employees. Such individuals shall be employees of Licensee, be subject to appearance standards mutually acceptable to the parties hereto and as permitted by Legal Requirements, and shall wear, at all times while working at the Stadium, neat and clean uniforms provided by Licensee and

approved by Licensor as aforesaid. Such uniforms shall bear such lettering and insignia as Licensor may require and shall be of a design reasonably satisfactory to the Licensor. Licensor and Licensee acknowledge that Licensee is an independent contractor for all services required to be performed under this Agreement. Any and all persons who furnish services under this Agreement, whether or not employed by Licensee prior to the effective date hereof, are exclusively employees, subcontractors and/or non-affiliated third parties employed by Licensee and are not employees of Licensor. Licensor shall not have control over the method or manner in which Licensee's employees perform the services required under this Agreement. All liabilities that may arise as a result of Licensee's status as an employer shall be borne exclusively by Licensee including without limitation, liability relating to documents to be filed with respect to the Federal Insurance Contribution Act and the Federal Unemployment Tax Act or any similar federal or state legislation.

Licensee must maintain accurate records of the names, addresses and other legal identification of those to whom Licensee issues employee badges to assure the proper identification and legal working status of Licensee's employees at the Stadium.

(b)    Licensor shall have the right, not to be unreasonably withheld, to approve the selection of Licensee's on-site general manager and all staff and shall have the right (based upon cause, as reasonably determined by Licensor) to require termination of such on-site general manager. Licensor shall have the right to approve general staffing levels for events. Nothing herein shall be construed as requiring Licensee to act in contravention of any Legal Requirement.

(c)    Licensee shall prepare training programs for all of its employees working in the Stadium. The training programs will be mandatory for all employees and at a minimum will include alcohol management techniques, customer service and specific job skills training. The programs shall be prepared and conducted by personnel specialists, using modern audio-visual aids and other techniques to maintain employee interest. All employees will also attend such policy and procedures training sessions as may be held by the Licensor, as well as the Stadium orientation tour conducted by the Licensor.

(d)    Licensor is committed to equal opportunity in employment and in the awarding of contracts for goods and services. In performing under this Agreement, Licensee shall not discriminate against any worker, employee or applicant, or any member of the public because of race, creed, color, age, religion, sex, national origin or disability (as defined by the Americans with Disabilities Act) nor otherwise commit an unfair employment practice. Licensee will take affirmative action to ensure that applicants are employed, and that employees are dealt with during employment without regard to their race, creed, color, age, religion, sex, or national origin. Applicants or employees with disabilities covered by the American with Disabilities Act shall be dealt with in accordance with ADA requirements. Affirmative Action and accommodations for the disabled shall include, but not be limited to the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation, selection for training and/or apprenticeship. Licensee agrees to comply with the same commitment towards minority hiring levels as utilized by the Licensor for general Stadium operations. Licensee shall have a written policy statement setting forth its policies and practices with respect to Equal Opportunity and ADA requirements. Licensee shall require its contractors and subcontractors to comply with these requirements. Additionally, Licensee hereby agrees to cooperate with Licensor in developing and implementing Licensor's hiring goals and obligations including without limitation those to which Licensor is legally obligated to maintain or achieve. It is understood and agreed that Licensee shall make good faith and non-discriminatory efforts to meet all MBE, WBE and DBE requirements, including relationships in which such parties are sub-contractors to Licensee, which are mandated in Part II C of the Economic Opportunity Plan and in the supplemental letter attached hereto as Exhibit "E".

(e)     Licensee agrees not to actively oppose any organizing campaign conducted by its employees at the Stadium, nor will it require a formal National Labor Regulations Board supervised election provided that it is presented with appropriate representation cards duly executed by a majority of its on-site employees.

(f)     Licensee shall promptly notify Licensor upon voluntary or involuntary termination of employment of its employees and ensure that such terminated individual is denied further access to the Stadium.

**6.3     Licenses and Permits.**

(a)     During the Term, Licensee shall obtain on or before the Commencement Date and thereafter maintain, at its cost and in its name, all licenses and permits necessary for the operation of the Concession Services, including the sale of Refreshments, including those required for the on-premise sale of Alcoholic Beverages.  In the event that Licensee does not so obtain, or fails to maintain any required licenses and/or permits for any reason whatsoever, it shall be considered a default and Licensor may terminate this Agreement, provided Licensee does not obtain or maintain such license or permit within 5 days after notice from Licensor.  However, the foregoing cure period shall not apply if the failure to obtain or maintain a license or permit results in the inability to legally serve Refreshments. The foregoing default provision shall be non-applicable if Licensee's inability to obtain or maintain a license is the result of any actions or inactions of Licensor or its contractors (such as a failure to obtain a certificate of occupancy for a particular Concession Facility).

(b)     In furtherance of the foregoing, Licensor agrees to cooperate with Licensee in connection with applications submitted by Licensee for any and all licenses and permits and renewals thereof. Licensor agrees to request that Owner provide Licensor the required designation under applicable law to enable Licensee to validly apply for the appropriate Alcoholic Beverage license. Licensor acknowledges that receipt of such designation is a condition precedent to Licensee fulfilling its obligations under Section 6.3(a) above.

(c)     In connection with the foregoing, Licensee agrees that its application(s) for all permits and licenses required to be obtained by Licensee hereunder, including without limitation, licenses for the sale of Alcoholic Beverages shall be coordinated with any other applications for permits and licenses being submitted by other vendors or service providers at the Stadium, including the Premium Caterer and any operator of a restaurant(s) facility in the Stadium, if any.  Licensee hereby agrees not to submit any application for a permit or license or renewal of same without first obtaining the written consent of Licensor.

(d)     Licensee shall pay all fees and taxes which may be due and owing, from time to time, to federal, state or municipal authorities incidental to its operations hereunder.

(e)     Licensee shall furnish Licensor with copies of such licenses and permits and renewals thereof as are physically maintained at the Stadium, as applicable and all other licenses or permits required.

**6.4     Compliance with Laws, Policies and Programs.**

(a)     In connection with the sale of Refreshments hereunder, Licensee shall in good faith comply and faithfully observe all Legal Requirements (including without limitation all fire, building, health, sanitation and environmental codes and regulations and liquor control laws and regulations).

(b)     With respect to the sale of Alcoholic Beverages, the Licensor specifically grants to Licensee:

      (i)     The right to enforce all Pennsylvania laws, rules, regulations or orders relating to the premises licensed pursuant to this Agreement and to enforce all rules, regulations or orders of the Pennsylvania Department of Liquor Control or other regulatory agencies relating to the Licenses.

      (ii)    Full right, power and authority to take any and all actions necessary to enable and to ensure compliance with all laws, rules, regulations and orders concerning the sale and consumption of alcoholic beverages in the Stadium.

      (iii)   The decision to serve or refuse service of Alcoholic Beverages to any individual shall be the sole responsibility of Licensee.

## 6.5     Proceedings Involving Licenses and Permits.

Subject to the conditional cure period provided in subsection 6.3(a) hereof, in the event of any suspension or revocation of Licensee's license to serve alcoholic beverages, and if such suspension or revocation shall not be stayed or appealed in such manner that will permit to continue to conduct operations and to serve alcoholic beverages at the Stadium, or in the event of the suspension or revocation of any other license which renders Licensee unable to perform its duties and obligations hereunder, it shall be considered a default and Licensor may immediately terminate this Agreement. In connection therewith, Licensee acknowledges that Licensee shall be responsible to Licensor for the loss of income and all other damages, including consequential and special damages, suffered by Licensor as the result of Licensee's breach of this Agreement.

## 6.6     Hours of Operation.

Subject to reasonable approval by Licensor, Licensee will open the Concession Facilities sufficiently prior to the opening of the gates by Licensor for each Event to allow time for guests to purchase Refreshments and will continue to provide services until each such Event ends or such further time as may be reasonably necessary to adequately meet public demand subject to Licensor's requirements regarding the sale of alcoholic beverages.

Licensee shall cooperate with Licensor in suspending or modifying its operations at Licensor's reasonable request to accommodate national or international events, such as sports championships, when such suspension or modification is reasonably required to obtain the event; provided, however, that none of Licensee's equipment and/or labor shall be utilized by third parties when Licensee's operations are modified or suspended.

## 6.7     Maintenance and Refuse.

(a)     Licensee shall be responsible for the maintenance, repair and replacement (subject to the limitation set forth below) of all Concession Equipment, uniforms, Smallwares and Concession Facilities provided however Licensee shall only be responsible to replace any Concession Equipment (or component thereof) to the extent the need for replacement was caused by Licensee or its employees' or agents' misuse or failure to maintain same as required by this Agreement. The Licensor may require the use of its in-house maintenance staff for repairs and maintenance provided the use of

such personnel does not void any manufacturer or similar warranty and if such personnel is used, Licensee shall have no obligation to replace items serviced by such personnel unless due to damage caused by Licensee's negligence or intentional acts. Licensor shall provide Licensee with Licensor's rights with respect to any manufacturer's or vendor warranties with respect to the Concession Equipment and Concession Facilities required to be repaired by Licensee. Licensee shall also, at its sole cost and expense, clean the grease interceptors and stove hoods at regular scheduled intervals using designated repair techniques to protect warranties and respect supplier agreements and otherwise to a level to promote the commercially reasonable useful life of such items.

(b)    Licensee shall keep the Concession Facilities neat and clean. Licensee is responsible for all sanitation and maintenance of the Concession Facilities and the area within a 25-foot radius, including condiment stations. Licensee will not permit its employees to dispose of or discharge waste, garbage or refuse in any area in or outside the Stadium other than in areas specifically designated therefor. In addition, Licensee shall be responsible for cleaning the Concession Facilities. The Licensee agrees to bag all trash from all its operations within the scope of its Operating Rights as described in Article III prior to, during and after any Event. Bagged trash will be placed outside Concession Facilities for pickup by Licensor at times designated by Licensor. Licensee shall take all trash from its commissaries to the dumpsters. All trash and garbage receptacles within the areas controlled by Licensee will be cleaned and sanitized by Licensee to insure a high standard of sanitation. Licensee will comply with all recycling programs implemented by Licensor. The cost of removing the trash from the Stadium and maintaining the trash receptacles will be the responsibility of the Licensor. The Licensor will determine the location of the trash receptacles. The Licensee will notify the Licensor when garbage receptacles are full and need to be emptied. The Licensee will not be allowed to pile trash around the outside of the garbage receptacles or over fill them in such a manner as to cause trash to spill or fall out of the garbage receptacles during transport. The Licensor shall maintain all trash cans used by the public and the Licensee shall maintain all trashcans used by its employees.

(c)    Each party agrees not to use Hazardous Substances at the Stadium, except in accordance with applicable Legal Requirements and agrees to indemnify, defend, and hold the other party harmless for all losses, costs, damages, liabilities and expenses arising out of its use, generation or storage of Hazardous Substances at the Stadium.

(d)    The Licensee shall engage the services of an exterminator approved or designated by Licensor to control vermin and pests within the Concession Facilities as necessary at the Licensee's sole cost and expense; or, at Licensor's sole option, Licensor shall be responsible for exterminator services in the Concession Facilities and shall bill Licensee for same at market rates. Licensor shall cause the remainder of the Stadium to be serviced by an exterminator service.

**6.8    Deliveries.**

All deliveries of Refreshments and other items used or sold by Licensee at the Stadium shall be made only during normal operating hours and shall be made through a gate or gates designated by Licensor. Licensee shall use reasonable efforts to prevent the entry of any unauthorized persons into the Stadium through such gate or gates when open for purpose of such deliveries. Deliveries will be scheduled to avoid the day or evening of, or otherwise conflicting with, an Event to the greatest extent possible.

**6.9    Mechanics Lien.**

Licensee shall at all times protect and keep the Concession Facilities and Concession Equipment and all other areas of the Stadium free and clear of all mechanics and other liens, attachments,

encumbrances, or claims arising out of Licensee's operations hereunder, its performance under this Agreement and/or its use of the foregoing. In the event any such lien is placed, or such encumbrances created, Licensee shall cause any such liens to be promptly removed, and if necessary, shall provide the liened party or court of competent jurisdiction with a performance bond or other reasonable security in scope and amounts reasonably acceptable to Licensor.

### 6.10    Products and Prices.

(a)    Licensee agrees that it will have available at all times sufficient quantities and varieties of wholesome Refreshments. Title to the Refreshments shall remain vested in Licensee. Consumables shall be first quality, wholesome and pure, and all products on hand shall be stored and handled with due regard for sanitation. Prices, portions, sources of supply, quality, product selection, and (except with respect to Alcoholic Beverages) specific brands shall be subject to Licensor's prior approval, which shall not be unreasonably withheld, provided that same are generally comparable to those appearing in other NFL Stadiums (e.g., Pittsburgh, Cincinnati, Cleveland) and arenas of similar size and nature and provided that the use of a particular brand does not conflict with or violate any Stadium Right(s). Subject to Licensor's prior written approval which shall not be unreasonably withheld, Licensee shall also be entitled to use and promote any "private brand products" which do not violate Stadium Rights. Licensee will post menus, with prices, in conspicuous places within or adjacent to the Concession Facilities. The design of such menu boards may not be of a gaudy or offensive nature and shall be subject to Licensor's approval.

(b)    Unless otherwise approved in writing by Licensor, all beverage products will be served only in paper or containers which have been approved in writing by Licensor. Beverage products shall not be served in bottles or cans. However, vendors may sell canned or bottled beverages in the stands as long as poured in paper or plastic cups prior to delivery to the customer.

### 6.11    Licensed Products/Designed Products/Sublicenses.

(a)    With the exception of Alcoholic Beverages, the Licensor shall have the right to require Licensee to use all reasonable commercial efforts to sell certain designated brands ("Designated Products") and to otherwise take innovative action to increase sales and/or improve customer satisfaction, provided that pricing, quality and service offered Licensee for such Designated Products is reasonably comparable to that from any third party vendors of like kind products. Licensee acknowledges that nothing herein grants Licensee the right to sell sponsorships or advertising space at the Stadium or any signage related thereto or take any action which would violate any provisions of the Stadium Rights. All sums paid by the provider or supplier of a Designated Product(s) shall be the sole property of Licensor. There shall be no Licensed Products Charges associated with any Designated Products unless such Designated Product(s) is also a Licensed Product(s).

(b)    Licensee confirms that Licensor shall also have the right to require Licensee to sell certain Licensed Products. Any Licensed Product Charges shall be deducted from Rents payable hereunder pursuant to Paragraph 5.1(c) hereof. All sums payable by the provider or sponsor of Licensed Products shall be the sole property of Licensor.

(c)    Nothing contained in Section 6.11(a) or (b) above shall require Licensee to purchase or rent any equipment required in connection with any Designated Product which Licensor required Licensee to sell. The costs of any such equipment shall be borne by Licensor.

(d)    Subject to Licensor's prior written approval, in Licensor's sole discretion, Licensee shall have the right to sublet or license Concession Facilities and the Concession Equipment related thereto to third party vendors (including both private and charitable and/or not-for-profit organizations), provided that such action does not result in labor disputes or other disruption of any kind in the performance of the Concession Services. The terms of such sublets shall be subject to the mutual approval of Licensor and Licensee. To the extent permitted by Legal Requirements and subject to Licensor's approval (in its sole discretion), Licensee may retain charitable groups to staff concession stands and pay same a commission for such services in lieu of wages, and such use of group services will not be considered a "sublet" of the facility.

(e)    The parties acknowledge that Licensor may be required to cause Licensee to sublet certain of the Concession Facilities to individuals or entities qualifying under various MBE/WBE/DBE programs ("MBE Subcontractor(s)"). Licensee agrees to enter into sublets and cooperate with any such subcontractors. It is agreed that the terms and conditions of any such MBE/WBE/DBE subcontracts, including the occupancy or license fee due thereunder, shall be determined by Licensor, after consultation with Licensee. Licensee shall be responsible to manage such subleasing arrangement, including the monitoring of all MBE Subcontractor Sales, remittance of Licensor's portion of such Sales to Licensor (on or before the 15th day of the following month) and the enforcement of all quality control and other obligations set forth in this Agreement applicable to all Concession Services, including without limitation, the reporting requirements set forth in 5.3 hereof.. In consideration of the foregoing, Licensor shall pay Licensee the 5% MBE Subcontractor Supervisory Fee. Such payment may be effectuated by Licensee deducting the Supervisory Fee from the funds to be remitted to Licensor as provided above.

**6.12    Approval Procedure.**

No later than 45 days prior to the commencement of each Fiscal Year, Licensee will provide Licensor with its business plan, including projected operating budgets, for the ensuing Fiscal Year. Such plan shall include the menu, portion size, branding and pricing schedule for the Stadium by type of location, or as otherwise directed by Licensor. Licensor shall notify Licensee of changes it desires and the reasons therefor within 30 days following receipt of Licensee's business plan.

**6.13    Altering Facilities.**

The Licensee shall not materially alter, add to or in any material way vary the Concession Facilities, or Concession Equipment or make any material alterations or installations without having first obtained the consent in writing of Licensor. All alterations and installation shall conform to and be made in accordance with all applicable laws, ordinances and regulations using first quality materials and workmanship.

The location of all Concession Facilities, whether temporary or permanent, including the Mobile Stands, shall be determined by Licensor. Licensee shall not acquire any rights to such assigned areas except as may be set forth in this Agreement. Licensee, at Licensor's request, shall promptly remove Mobile Stands to facilitate the needs of events.

**6.14    Advertising Restrictions.**

Licensee acknowledges that all advertising rights at the Stadium belong to Licensor. Licensee shall not (i) advertise any brand names in the Stadium; (ii) use the name or logo of the Stadium on any material; (iii) place advertising of any kind on Licensee's or third party's equipment; or (iv) advertise in

any manner or form, or about the Stadium, or elsewhere or in any newspaper or otherwise without the written approval of Licensor.

Licensor may require Licensee to use specially designed logoed uniforms, sales material, menus, cups, napkins or other material. Licensor shall provide any required logo design to Licensee.

Licensee shall have no right to use the Stadium Rights or trademarks, symbols or trade name or name of the Licensor directly or indirectly, in connection with any production, promotion, service or publication without the written approval of the Licensor. The foregoing shall not be construed to limit Licensee's right to use Licensee's logos (or those of its suppliers) in the ordinary course of its business at the Stadium or its uniforms, menus, cups and products subject to the provisions of this Agreement and Licensor's right of approval.

Notwithstanding anything herein to the contrary, Licensor may sell advertising and sponsorship packages for the Stadium, which may include product availability rights at the Stadium, where legally permissible. Such rights may be granted by Licensor in connection with Designated Products or otherwise. Therefore, except with respect to alcoholic beverages, Licensor reserves the final right of approval of Licensee's sources of product supply. Licensee shall honor all rights granted to these advertisers.

## ARTICLE VII

### Indemnification and Insurance

**7.1    Waiver of Subrogation Rights.**

Notwithstanding any other provision of this Agreement, it is expressly agreed that neither the Licensor nor Licensee shall be liable to the other, and each such party hereto hereby releases and waives all claims, rights of recovery, and causes of action that either such party or any party claiming by, through or under such party, by subrogation or otherwise, may now or hereafter have against the other party or any of the other party's directors, officers, employees, or agents for any loss or damage that may occur to the Stadium, the Concession Facilities and/or the Concession Equipment, any of the contents of the Stadium, or for any interruption in the business of either of them, if sustained by reason of fire, (even if such fire is the result of the negligence or gross negligence of either of the parties hereto or any one or more of their directors, officers, employees or agents), or if sustained by reason of storm damage or the elements, or by other casualty to the extent that such loss or damage is of a type that is, by its nature, recoverable by insurance (including any deductible), regardless of whether any policy is actually in effect. Both the Licensor and Licensee shall cause their respective insurance carriers to include provisions in all applicable policies authorizing the waiver of any rights by way of subrogation each might have against the other.

**7.2    Indemnification.**

(a)    The Licensee and the Licensor (the "Indemnitor") each agree to indemnify, defend and save and hold harmless the other (the "Indemnitee") from and against all suits and claims that may be based on any injury or alleged injury to any person (including death) or to the property of any person not a party hereto, that may arise, or that may be alleged to have arisen out of the negligence, intentional action or breach of their respective obligations under this Agreement of the Indemnitor or that of its employees, servants or agents. In any such event, the Indemnitor, at its own cost and expense, shall pay all reasonable charges of attorneys and all costs and other expenses arising therefrom or incurred by the Indemnitee in connection therewith. The foregoing indemnity shall not apply with respect to any

injuries which may be alleged to have arisen out of the negligence or intentional action of the Indemnitor if and to the extent the same shall be ultimately determined to have arisen out of the negligence or intentional action of the Indemnitee.

(b)    In addition to the foregoing, Licensee agrees to indemnify, defend and save and hold harmless the Additional indemnities from and against all losses that may be based on any injury or alleged injury to any person (including death) or to the property of any person not a party hereto, that may arise, or that may be alleged to have arisen out of (i) the use or occupancy or manner of use or occupancy of the Stadium by Licensee or its employees, agents, contractors, or invitees, or any person claiming under Licensee, or its employees, agents, contractors, or invitees; (ii) any activity, inactivity, work or thing done or permitted by Licensee or to employees, contractors, or invitees in or about the Stadium; and (iii) any injury or damage to the person, property or business of Licensee, its employees, agents, contractors, or invitees entering upon the Stadium under express or implied invitation of Licensee. In any such event, the Licensee, at its own cost and expense, shall pay all reasonable charges of attorneys and all costs and other expenses arising therefrom or incurred by the Owner in connection therewith. The foregoing indemnity shall not apply with respect to any injuries which may be alleged to have arisen out of the negligence or intentional action of the Licensee if and to the extent the same shall be ultimately determined to have arisen out of the negligence or intentional action of the Additional indemnitiees.

**7.3    Licensee's Insurance.**

(a)    Prior to commencing any activity pursuant to this Agreement, Licensee shall obtain and thereafter continue to maintain the following insurance coverages:

| (i) Type of Insurance | Liability Limits | |
|---|---|---|
| 1. Worker's Compensation | Statutory | |
| 2. Employer's Liability | $1,000,000 each occurrence<br>$500,000 disease policy limit<br>~~$100,000~~ $1,000,000 each employee | |
| 3. Commercial Automobile Liability* | $1,000,000 CSL each occurrence | |
| 4. Commercial General Liability(1) | Each Occurrence -<br>General Aggregate -<br>Products/Completed<br>Operations Aggregate | $1,000,000<br>$2,000,000<br><br>$2,000,000 |
| 5. Umbrella Liability (1) | General Aggregate<br>Products-Completed<br>Operations Aggregate<br>Each Incident Limit | $10,000,000<br><br>$10,000,000<br>$10,000,000 |
| 6. Liquor Liability/Dram Shop Liability (1)(2) | Liquor Liability – Each Common Cause Limit<br>Liquor Liability – Aggregate Limit | $10,000,000<br><br>$10,000,000 |